19899

William B. DOUGLAS, Appellant, v. FIRST PROVIDENT
CORPORATION OF SOUTH CAROLINA et al., Respondents

(209 S. E. (2d) 49)

*E. N. Zeigler, Esq.,* of Florence, *for Appellant,*

*T. Kenneth Summerford, Esq.,* of Florence, *for Respondents,*

*E. N. Zeigler, Esq.,* of Florence, *for Appellant,* in Reply. October 11, 1974.

BRAILSFORD, Justice:

The genesis of this controversy was the laying out by First Provident Corporation of a residential development near the City of Florence and the construction of some forty residences therein without first providing for adequate drainage. This appeal is a sequel to Clemson University against First Provident Corporation, *et al.,* consolidated with William B. Douglas against the same defendants, 260 S. C. 640, 197 S. E. (2d) 914 (1973), wherein, after defendants had trespassed upon the contiguous lands of the two plaintiffs by clearing a right-of-way for the construction of a large canal, they were enjoined from doing so, but their prescriptive rights in old ditches traversing plaintiffs' lands were recognized.

Upon remand and after a hearing, the court passed an order which purported to authorize defendants to restore one of the ditches to its former depth and width, specifically, to straddle the ditch with a backhoe, clearing the banks as needed, and to excavate to a depth not exceeding 3.3 feet below the existing bottom of the ditch at any point, but without specific limitation on the width of the excavation.

The plaintiff Douglas has appealed, basically upon the ground that the decree imposes burdens on his land which far exceed the prescriptive rights of the defendant First Provident. Clemson University has not appealed.

We shall omit a general restatement of facts which may be adequately understood by reading the opinion on the first appeal, and endeavor to state those necessary to this appeal as briefly as may be.

An ancient, hand-dug ditch traverses the subdivision from the east, thence in a westerly direction through property of Pinemont Realty, the Pee Dee Experimental Station of Clemson University, William B. Douglas and others, to its outfall in Beaverdam Creek. This is referred to in the record as the east-west ditch or route. It has furnished the only significant drainage available to the area in question for as long as any witness recalls, at least since the witness Harrell went to work for the experimental station in 1934.

About 2000 feet west of the subdivision, another ancient ditch branches off from the east-west ditch northward along the boundary between Douglas and Clemson lands, thence through lands of Andrews and lands of others to McCall Branch. Before the commencement of this action First Provident improved a canal along the route of this ditch across the property of Andrews, north of the Douglas property, to the Douglas line, where the extension of the canal was stopped by injunction. The order appealed from applies to the north-south ditch. The order reserves any determination of the developer's rights in the east-west ditch.

Within the lands of Douglas and the experimental station, a ridge athwart the north-south ditch forms a natural watershed. Water falling north of this ridge drains north into McCall Branch, that falling south of it drains south into the east-west ditch, thence to Beaverdam Creek. The existing bottom of the north-south ditch is not on grade through this ridge. Water entering the ditch follows the natural watershed, north or south as the case may be, result-

ing in what is referred to in the record as a two-way ditch. This is not an entirely apt description because the high point in the existing ditch bottom is near the ditch junction and the next highest point is at the ridge some 800 feet to the north. Water entering the ditch south of the ridge is trapped between these points and, except for overflow, cannot drain in either direction.

D. C. Barbot, Jr., an engineer employed by the developer to solve its drainage problem, testified at the post-remand hearing that in his opinion the north-south ditch had originally been cut to a 0.10% grade from its junction with the east-west ditch to an outfall in McCall Branch, and that, at this grade and between these points, the ditch would be capable of furnishing adequate drainage to the property in question and had done so in the past. The witness further testified that the ditch has been filled in by crumbling of the banks and an accumulation of sand, dirt and other materials over the years, and that the original depth would be restored by establishing the suggested grade, which could be accomplished by excavating not more than 3.3 feet below the existing bottom at any point.

Based upon this testimony, the court authorized the excavation of the ditch by the means and to the extent indicated above. Reluctant as we are to reverse the able judge of the court below on a finding of fact, this is an equity case in which it is our responsibility to weigh the evidence. Careful consideration of the record of the original and post-remand hearings leads to the clear conviction that the court's finding that the north-south ditch was originally dug to grade through the highland forming a natural watershed between the east-west ditch and McCall Branch is against the clear preponderance of the evidence.

Barbot testified at the original hearing that his first plan was to follow the natural drainage to Beaverdam Creek by the east-west route. He was attracted to the north-south route when Douglas indicated a preference for it during right-of-way negotiations.

A Barbot drawing labeled "Original Profiles Ground & Ditches" was introduced in evidence at the original hearing. The profile of the east-west ditch includes the higher ditch bank and the bottom of the existing ditch, with elevations every 200 feet. A straight dotted line, below the existing ditch bottom, designated "Estimated Original Ditch Grade @ 0.10%" is depicted. The profile of the north-south ditch is similar except for the omission of the line representing estimated original ditch grade. This is consistent with Barbot's testimony that he established the original grade of the east-west ditch by digging through the sediment to the solid clay at a number of points. He did not make similar excavations in the north-south route.

At the original hearing, without relating the feasibility of the north-south route (against the natural watershed) to the original grade of the ditch in any way, Barbot testified that his survey determined that the newly dug canal on Andrews' land was deep enough to furnish "sufficient fall to take the water in that direction." To accomplish this, the existing ditch would have to be lowered some four feet in places to a depth of something like 8.3 feet. The ditch would have to be "cut real deep, but it was feasible."

When Barbot was recalled at the post-remand hearing, he produced another copy of the drawing which had been used at the first reference. A dotted line below the existing bottom of the north-south ditch, corresponding to the line on the east-west profile designated as "Estimated Original Ditch Grade @ 0.10%." appears on this copy of the profile of the north-south ditch. However, this new line bore no descriptive designation by the draftsman, and the witness did not identify it orally as representing the original ditch grade, real or estimated.

We quote from the witness' testimony:

"Now, I will ask you what in your opinion is the maximum amount of dirt that would have to be excavated from . . . this north-south ditch in order to restore it, in your opinion, to its original depth?

"A. I would say on the north-south ditch the maximum amount of dirt that would have to be removed would be somewhere in the neighborhood of 3 to 3.3 feet.

.  .  .  .  .

"Q. And that is, of course, not a regular thing? You are not saying that it would be 3.3 feet throughout the entire area?

"A. It would vary . . . but this is generally what would be required to establish a grade of approximately one-tenth percent on that ditch.

"Q. In your opinion then that would restore that ditch to its original depth?

"A. Yes, sir, I think that would restore the ditch to the original depth and the original intent for which that ditch was dug—to drain the lower area of Mr. Douglas's and of Clemson University."

Absent any testimony that the witness conducted an on-site investigation by removal of sediment from the ditch bottom, or applied any other engineering procedure to ascertain the original depth and grade of the ditch, of which there is none, his testimony that the excavation which he found to be necessary to the northward flow of the water would also restore the ditch to its original depth and grade was of no probative value. He simply assumes that the ditch was originally dug to drain water from the area south of the watershed into McCall Branch and assigns to it the minimum depth and grade to accomplish this purpose. This assumption is opposed by all of the other testimony in point, including that of the witness Harrell, who knew the property intimately during thirty-eight years as an employee of the experimental station, and that of the sixty-five-year-old appellant, who has known the property, which formerly belonged to his father, since boyhood. We conclude that the court's finding on this dispositive issue of fact was error, and that the order appealed from imposes burdens on ap-

pellant's land which exceed the respondent's prescriptive rights therein.

Reversed.

Moss, C. J., and Lewis and Littlejohn, JJ., concur.

Bussey, J., dissents.

Bussey, Justice (dissenting) :

Not being persuaded by the opinion of Mr. Justice Brailsford, I most respectfully dissent. Before proceeding to a discussion of the issues, in fairness to the witness Barbot, it should, I think, be pointed out that any apparent inconsistency between his testimony at the first hearing and that at the second was, to my mind, very logically explained by him. Upon the first hearing, First Provident contemplated digging a canal which would not only adequately provide for the drainage of the particular subdivision but take care of water draining from beyond said subdivision as a result of anticipated development by others. Upon the second hearing his testimony was addressed to a proposal designed to take care of only the immediate problems of the particular subdivision.

As I understand it the opinion is predicated on the proposition that the opinion of Barbot as to the original depth and grade of the north-south ditch was without probative value because he did not testify that he had endeavored to ascertain the depth thereof by the excavation and removal of sediment from the ditch bottom. It is not at all clear to me that Barbot did not, in fact, make, prior to the first hearing, excavations in the north-south ditch just as he did in the east-west ditch. On the first hearing, in speaking of the tests he made, he consistently referred to "ditches," using the plural rather than the singular. If, in fact, he did not make any such excavation in the north-south ditch prior to the first hearing his failure to do so thereafter is understandable since he was under a court injunction not to set his foot upon the premises.

Whether in fact such excavations were made is, I think, relatively unimportant. There was evidence at the first hearing that both ditches had filled in through the years to the extent of 2 to 2½ feet and not even Douglas disputed that both ditches had substantially filled in. He questioned whether they had filled in quite as much as contended by Barbot, but admitted that he did not know or have any accurate idea as to just how much they had filled in. Prior to the first hearing Barbot had surveyed the north-south ditch throughout its length recording the elevation of the existing bottom thereof at intervals of 200 feet, said ditch being a total length of some 2,265 feet. Additionally he had the benefit of a profile of the north-south ditch made by Bryce, Douglas' engineer, which showed the elevation of the banks and existing bottom of the north-south ditch at intervals of 100 feet.

The qualifications of Barbot as an experienced engineer were admitted. Assuming that he had made no excavation in the north-south ditch, similar to those made by him in the east-west ditch, his knowledge of the extent of the fill in the east-west ditch, the general topography, the history of the area, his and Bryce's profiles of the existing bottom of the north-south ditch constituted, in my opinion, completely sufficient data upon which a competent engineer could express an opinion of great probative value as to the approximate original grade and depth of the north-south ditch. Indeed I do not read the cross-examination of Barbot, or the testimony of any other witnesses, as even remotely contending that Barbot did not have sufficient data upon which to form an expert opinion of probative value.

Mr. Bryce, engineer for Mr. Douglas, was shown Mr. Barbot's profile of the two ditches and asked the following questions: "In your opinion, do you think Mr. Barbot's testimony as it relates to this chart here, is that about, in your opinion, what the original ditches were, the elevations were, the depth, and so forth?" Mr. Bryce responded "That would appear to be a pretty good simile of what was possibly

there. It is hard to say exactly as to what the depth might have been." At other points in his testimony Mr. Bryce expressed the opinion that the north-south ditch drained both ways from the ridge and disagreed with Barbot's opinion as to depth of the north-south ditch, especially at the ridge, Barbot having testified that it was originally six or more feet deep at such point. Bryce, however, did not give the basis of his opinions as to these particulars and in my view the profile prepared by Bryce rather definitely supports the opinion of Barbot rather than that of Bryce.

For hopefully a clearer understanding of the factual situation, the north-south ditch is 2,265 feet long. The precise elevation of the ridge through which this ditch runs is not reflected in the record, but it is undisputed that the general topography is relatively flat. Bryce's profile of the existing bank on the east side of the north-south ditch would indicate the elevation of this ridge to be slightly more than one foot higher than ground level at the point of the intersection of the two ditches. Said ridge is 1,065 feet north of the east-west ditch. Bryce's profile also shows that beginning at a point approximately 100 feet south of the crest of this ridge and extending southward for a distance of 300 or 400 feet the ground level elevation is considerably lower than the ground level elevation at both the ridge and the intersection of the two ditches. Stated otherwise the north-south ditch traversed a valley between the east-west ditch and the ridge to which so much importance is attached.

The profiles of both engineers show the elevation of the existing bottom of the north-south ditch at its intersection with the east-west ditch as 135.1. References hereinafter are to the profile prepared by Bryce for Douglas. At points 165-265 feet north of the intersection the elevation of the existing bottom rises to 135.6 or a total rise of one-half foot. Such is the highest elevation at any point in the existing bottom of the ditch and is .2 of a foot higher than a hump in the bottom of the ditch at the ridge, inferentially caused by the caving or sloughing of the quite high ditch

banks at that point. The Bryce profile shows that while there are, of course, irregularities in the bottom of the existing ditch from the point of the intersection for a distance of 2,065 feet going northward there is a total fall of 2.7 feet in the existing bottom of the ditch which is a grade of somewhat more than the 0.10% testified to by Barbot.

The existing bottom of the east-west ditch is .9 of a foot lower than the existing bottom of the north-south ditch at the intersection. There is undisputed evidence that both ditches have filled in to a considerable extent and it is not at all unreasonable to infer, that on an average, they have filled in to the same extent. If such be a true inference it would seem to follow that when the north-south ditch was dug, the bottom thereof was approximately one foot higher than the bottom of the east-west ditch at the intersection. When all of the evidence from both parties is considered, to my mind, a most logical inference therefrom is as follows.

The north-south ditch, when originally dug, was intended to serve a dual purpose. It was so graded as to drain northward from its intersection with the east-west ditch at a grade of 0.10% or slightly more, but with the bottom elevation thereof at the intersection being approximately one foot higher than the bottom of the east-west ditch. In times of normal rainfall such was intended to drain the area immediately adjacent thereto on both sides thereof, and particularly the low lying area between the ridge and the east-west ditch, northward to McCall's branch. Additionally it was to serve the purpose of carrying the excess or overflow of the east-west ditch northward toward McCall's branch in times of excessive rainfall. There was, of course, no need for the owner to dig the ditch a foot lower throughout its entire length of nearly half a mile when he intended it to drain from the east-west ditch only in times of excessive rainfall. This inference is entirely consistent with the testimony of Harrell that the north-south ditch only carried, ran or had water in it at times of excessive rainfall.

A circumstance, not apparently stressed by any one, which I think of significance, is the fact that commencing at a point 200 feet south of the ridge and proceeding northward the present west bank of the north-south ditch averages from 1½ to 2 feet higher elevation than the east bank thereof. It is a matter of common knowledge that the vast majority of people are right-handed. It is also a matter of common knowledge, at least among ditch diggers and other shovelers, that a right-handed shoveler naturally throws dirt to his left. The higher west bank elevation gives clear rise to the inference, if not positive proof, that the digger or diggers of this ditch were digging from the south to the north through this ridge and for the purpose of carrying the water from the low area south of the ridge through the ridge in the direction of McCall's branch.

At the immediate point of the ridge, despite a caved in hump in the bottom of the ditch the same is still 3.4 feet deep at the present time, such being one of its deeper points. While Bryce disagrees with Barbot's view that it was originally six or more feet deep at this particular point, he does not contend that it has not filled in some or give an estimate as to how deep he thinks it might have been. In any event it is obvious that originally the ditch was considerably more than 3.4 feet deep at the ridge. In any view of the evidence the ditch was originally dug 4 to 6, or more, feet deep at that point which fact is totally inconsistent with the contention of Bryce and Douglas that the ditch was intended to drain in both directions from the ridge. No plausible reason for digging the ditch that deep through the ridge suggests itself other than the purpose of draining the water northward in the direction of the McCall branch. While admittedly no one can tell with precision the original dimensions of an ancient drainage ditch, I respectfully submit that the clear preponderance of the evidence, when carefully analyzed, supports the conclusion, as found by the trial judge, that Barbot's opinion as to the original depth and grade of this ditch is as near to the truth of the matter as anyone can get.